Oh, I think it's both good morning and good afternoon. This is Verna Wefald on behalf of Appellate Matthew Berckmann. The two issues that I want to discuss this morning are the propensity evidence and the sufficiency of evidence on Count 2. With respect to the argument regarding propensity evidence, the first, Mr. Berckmann was charged with, in Count 1, with assault by a dangerous weapon with intent to do bodily harm, and in Count 2, with assault by strangulation. It's important to emphasize that strangulation is defined as impeding the bleeding or cutting off the blood or circulation or whatever it is by applying pressure to the throat or the neck. The court admitted two other acts, other bad acts, one in Waikiki that took place afterwards and one in New Jersey, on the grounds that they helped the government to prove intent, knowledge, and state of mind. Unfortunately for Mr. Berckmann, these two other acts did neither. First, we all know that propensity evidence has long been prohibited, and these acts were nothing but prohibited propensity evidence. They were very inflammatory. What did the prior acts or the other acts show? In the Waikiki evidence, the lifeguard testified, he admitted that he had no idea who started the fight, and that Ms. Fenton got up, pushed and shoved Mr. Berckmann, who then grabbed her by the neck and then he hit and threw her against the bench, and some bystanders came over, and they started attacking Mr. Berckmann. Ms. Fenton got up and then started attacking, helping them, and then she joined Mr. Berckmann and started the bystanders. When the cops came, the bystanders fled, and basically Ms. Fenton did not press charges and she did not go to the hospital. In the New Jersey case, well... The argument you're just making sounds like you're making an argument that could have been made to the jury about who was at fault for that incident, but that's not really a question of whether it was offered for propensity or not. That's really, you're really disputing sort of what happened in that incident, it sounds like. I think the issue is whether, I mean, certainly the government's not going to argue that we offered it for propensity evidence. The government disputed that, but in fact, that is exactly what happened, because in the Waikiki case, and also in the New Jersey case, and in the case of the charge. But I mean, if the jury thought that the wife was at fault for that incident and she was the I mean, then it just doesn't go, it's not going to go toward conviction regardless, right? I'm sorry, did you repeat that? The issue I thought you were going to argue is somehow that there's a propensity inference, assuming that the husband is at fault. Well, the issue is, no, the issue is not necessarily who was at fault, but what did it prove? It proved nothing more than both Mr. Berkman and Ms. Fenton have serious drinking problems. They drink to excess, and when they do, they start smacking each other around. The Waikiki case, for example, it did not show anything about, first of all, there was no weapon involved, as it accounts to, and there was no evidence that he applied pressure to the throat or the neck in an attempt to strangle her. There was no intent to do bodily harm. It was simply nothing but prohibited propensity evidence, and even if there was some marginal relevance here, it was clearly more prejudicial than probative. This kind of evidence is so inflammatory. Counsel, let me jump in here, because in looking at these cases, and the court, the district court cited the Hinton case, and I've looked at a lot of cases in this area, and when it's a prior assault against the same victim in a charged assault case, it seems like our court and many other circuit courts have routinely said that is proper 404B for intent. Can you give us a case which involves the same victim in an assault case where a court has said that was improperly admitted? I cannot. However, I would like to discuss the Hinton case, because although it did involve the same victim, there's significant differences, and the Hinton case did not say, because it's the same victim, any time you've got the same victim and you have a so-called assault, that that evidence is admissible, and in the Hinton case, the husband's defense was, I only intended to frighten her, but not to stab her, because he stabbed the wife, and in that case, it was the wife who called the police, and the wife who testified against the husband, and testified about these prior assaults. We don't have anything like that, and there is nothing in that particular case that says, any time you have two husband and wife with drinking problems, and they start smacking each other around because they've been drinking too much, well, that's all you need to do to bring it in. But let me go back to what you just said, because it seems to me the government had to prove intent here, and the defense in this case could have been, as the trial went through, well, look, they're just goofing around, this horseplay, you know, it's not an attempted assault, but the fact that they have a repeated history of drinking and then starting smacking each other, that would seem to me to prove his intent on that day at the park was not horseplay, it was to smack her around and assault her, so it seems to me that that's just more evidence of that, when they get drunk, he hits her, that hurts you, it seems to me, because that shows what his intent is during those times, so again, how do you, help me here, because I think you got a tough, I'm going to be straight with you, you got a tough argument on this one, so help me understand why that isn't proper intent, if it shows that in these situations he likes to hit her, why isn't that admissible intent evidence in this case? Because, think about it, let's go back to the fact about how drunk they were, I mean, and you know, what sort of intent does he have when he's that inebriated, is he saying, you know, he's so drunk that he's going to plan to hit my wife, I don't think so, these people are completely out of control, think about all these people who are in drunken fights, he's probably the only intent he had in his mind was maybe that he would not fall down after having drunken that much. But there was a defense that he didn't have the mental capacity to form intent, was there? That's not your argument, I didn't think. Well, you know, voluntary intoxication traditionally is not usually a defense to big intent crime in the second county. So given that, I don't understand why the fact that they were drunk and had this pattern of fighting when they're drunk helps you. Well, it's, I think you have to go back to just how inebriated they are, but in any event, let's also examine the fact that maybe this was simple assault here, but the intent to, because he hasn't, you know, in the Waikiki case, there was no weapon, and there wasn't any evidence of strangulation, and I think that that's significant. And even if the issue of much more, it's so inflammatory that it is far more prejudicial than probative, and on that ground it should have been excluded. A jury is going to sit and think, you know, these people are just a bunch of drunks, and they go out in public places and they start getting really drunk and smacking each other around, and that is really nothing but prohibited propensity. It's the same thing with the New Jersey case. No weapon, no evidence of strangulation, and just a lot of screaming and yelling and drinking. Well, and punching. I mean, and the officer did testify there was punching. Well, at least arm swinging of some sort, right? Right. And her arm went up, too. And we don't know exactly what happened in that case. It's just the arms going up and arms going down and screaming and yelling and cursing. And I think that that's, because if this is not propensity. Threatening to kill her, I think, right? Pardon me? Threatening to kill her. You know, we don't have any evidence of that. The officer testified. Didn't the officer testify to that? In that incident, wasn't he part of that incident that he was saying, I'm going to kill you or something similar? Yes. I mean, they were screaming and yelling like that, but that, you know, those are the kinds of things people say that kind of thing all the time. That doesn't mean that there was a knife in hand. I'm sorry? There was a knife in hand. There was a knife, maybe not in the New Jersey one, but I don't remember. No, there was not. There was no weapon. The only weapon was in the charge, the Hawaii, the Hosmer Campground case. And even there, the witnesses who testified, getting into sort of the sufficiency issue, the witness, Mr. Roper, who testified, he admitted that he did not see Mr. Beck when Mr. Bergman was on top of his wife. He did not see him holding the wife, excuse me, the knife, you know, when he was supposedly had his forearm over her throat. And I think it's also important to mention, you know, I don't want to forget about the red marks on her neck. The officer who came to arrest him after it was called by 911 said that he noticed he had some red marks on her neck, but the government has conceded that. They don't know where these red marks came from. I mean, does it really matter? I mean, isn't the statute she was charged under specifically say, for strangulation, regardless of whether that conduct results in any visible injury, or whether there is any intent to kill. So, I mean, the red marks doesn't matter. There were marks, there weren't red marks. It seems like this argument is, the question is, did he, was there evidence to suggest that he knowingly impeded the normal breathing or circulation of the blood? And I mean, are you really contesting that there was zero evidence that he knowingly impeded breathing? Yes, that is what I mean. I agree that the red marks are basically red herring, so to speak. That the testimony of the two witnesses on direct examination were that he had his forearm on top of her, and like this, but no evidence. They did not testify that he applied pressure. They didn't testify that she was having difficulty breathing. There was nothing like that. And it's not enough to just say, you know, put his arm across her her throat. But didn't Zoyanovich say it was almost as though he was strangling her? I'm sorry, say that again. Zoyanovich, one of the witnesses said it looked as though he was strangling her. Well, she did say that on direct examination, but first of all, you know, that is really a legal conclusion. The judge should have sustained the objection that was made there. Although that is the statute of strangulation, strangulation is a very specific definition, and it's not enough to just say, you know, in our mind what we think is strangulation. It has to be. Well, I don't think you've appealed anything about a legal conclusion, objection, right? So we have to take that testimony as given, and once we take it in the light most favorable of the prosecution, I don't understand how that isn't evidence that he was trying to choke her. Well, I think in the light most favorable to the prosecution, you know, you say that it's strangulation. That doesn't mean you still have to go through the elements of the statute, and that is, and instead, because strangulation has a specific definition. Well, but I'm assuming you made, I'm assuming you made the arguments you're making to us before the jury, and the jury didn't agree. So, I mean, I don't understand how, I just don't understand the position that there's absolutely zero evidence that, you know, he knowingly impeded the normal breathing. I mean, or attempted to. Yeah. Do you want, again, do you want to reserve some time for rebuttal? Yes, I do. I do. Okay, we'll go ahead and reserve some time for it. We've got a lot of questions for you, so I'll give you an extra minute rebuttal, okay? Thank you. All right. Okay, please the court. Assistant United States Attorney Michael Albanese on behalf of the United States, I'll jump in and address the 404B argument, which counsel referred to off the bat. I think that counsel's arguments are a characterization of the two events, the Waikiki incident and the New Jersey incident, are not supported by the record. When the record is analyzed by the testimony that was given, it's clear that a jury could draw a conclusion that the defendant evinced an intent to harm Ms. Fenton in both incidents. In the Waikiki incident, although... And that's all that needs to be shown, right? We don't, that is to say, this evidence could be brought in just with an intent to harm. There doesn't have to be strangulation involved in both, in the prior... I say prior bad acts, but actually these two incidents occurred after the incident in which he was charged. Is that right? There were sort of subsequent acts. One was a subsequent act, the Waikiki incident and the New Jersey incident was prior. But you're correct, your honor, that it's an element of count one that the defendant intend to cause bodily harm, and so it's sufficient that the prior acts are relevant to that element. But I believe that there's, at least with regard to the Waikiki incident, where the testimony was that the defendant grabbed or picked up her by the neck and took her and flew her into the benches, there is some evidence there from which that the jury could conclude that the defendant intends to grab around that neck area, which would support an intent to strangle. But I believe it is the intent to cause bodily harm that is shown clearly in both incidents. While there's no evidence as to how the skirmish started, the evidence that does come forward is completely one-sided. The first impression by the lifeguard is that the Ms. Fenton is flying backwards, from which it could be inferred that she was shoved or whatever. And then when she rushes back to the defendant, he grabs her by the neck and throws her down. And there's really no evidence to say that she started it or that it was a mutual fight. And then the New Jersey incident is even more stark in the defendant's intent, where the officer observed the defendant on top of the victim and swinging downward with his arms, as if to punch her. And he did indeed yell, I'm going to effing kill you, you effing bitch. So he's clearly he's stating his intent in that purpose. Now, we don't know whether he would have carried out that threat to its ultimate conclusion, but he clearly demonstrates his intent to cause bodily harm, and that's sufficient to pass 404B in this case. Now, under different facts, the argument that these incidents are substantially more prejudicial could be well taken, but not here, where the intent evidence is so important. And I believe Judge Owens nailed it when he said that without such evidence, the jury could conclude that they were horsing around or that there was no genuine intent to cause bodily harm. But when those prior and where the defendant's intent is manifest, that defense is essentially nullified. And the jury does get that picture into how the defendant feels about his wife and what he intends to do to her when the situation arises. Counsel, there is a line of cases that says the fact that a victim fails to react a certain way after being assaulted is admissible for 404B. Here's what I mean for that. In opening statement, defense counsel said, suggested that after the assault at the park, the victim just kind of sat on the bench and just carried on as if nothing had happened. And there are some Ninth Circuit cases, one's called St. Ginny, I think, and then there are a bunch of other cases from other circuits that say the fact that a victim doesn't respond how you might expect someone who's just been punched to respond. You can introduce prior bad acts of previous assaults to explain why she's been taught essentially, keep your cool, don't fly off the handle or he's going to hit me again. I didn't see that argument made at all in terms of the admissibility of these acts. I just want to make sure that that was not argued to the district court. The evidence of the victim's behavior post-assault obviously did come in, was in front of the jury, and that was one of the bases on which the government sought to introduce a domestic violence expert to explain that behavior. The government was precluded from doing so, so the expert testimony never got in front of the judge. So are you basically arguing for like a domestic violence exception to 404B, a rule for 404B, like whenever there's a pattern of domestic violence it's always going to come in? Well, I hesitate to say always because there's, I mean, I think there's still a very important fact-specific inquiry, but I think that this is a matter of reality where you have a history of domestic violence, particularly where it's one-sided, where there's an aggressor and a victim. It's hard to imagine circumstances in which those prior acts would not demonstrate intent to cause bodily harm, and if indeed the count at trial involves that material element, then I'd say in the vast majority of those domestic violence cases it would be admissible subject to 403. And I think that the quote from the Eighth Circuit in Johnson, which we quoted in our brief, really sheds light on that and explains that kind of the modern thinking about domestic violence is that it's a story that involves periods of aggression and periods of reconnection between an assailant and a victim, and that this prior act's evidence is directly probative of that relationship and the defendant's intent to dominate, to control, and indeed cause bodily harm to his victim. It's a very fine line between saying this is a person who beats up his partners and has a propensity to do that, and this is a person who has an intent to hurt his partners. I mean, there is a really fine line here, I think, of whether this is propensity evidence at its core. I think the character trait of general violent disposition is certainly a character trait that would not be appropriate purpose to introduce an other act evidence, but how one person feels about another and how his actions are intended to if Mr. Berkman had beaten other partners in the past, separate girlfriends, and we attempted to introduce that in this case, and I'm not saying that that would be inadmissible. I'm just saying the calculus would be different, but it's hard to imagine when you look at the Ninth Circuit four-step test or four-element test to say, how are these other acts not probative of his intent to harm her? They clearly are, and then you just have to get to the point of, well, are they substantially or is the risk of unfair prejudice substantially outweigh the probative value, and that's going to be fact specific. Here, it was not an abuse of discretion for the court to find that the 403 test was met because we had a case in which the victim did not testify, in which there was no medical evidence of injury because the victim was uncooperative, and you were interpreting the observations of two eyewitnesses, albeit unbiased, unrelated witnesses, but two eyewitnesses who were standing some distance away, and so in light of those facts, intent was a critical element of the case, and these other acts are directly probative of that intent. I can move to sufficiency since that was the second point that counsel addressed, unless the court has further questions on the 404BPs. I'll simply just highlight that in looking at the facts in the light most favorable to the government, there was substantial evidence, and in fact, proof beyond a reasonable doubt, that the defendant was guilty of the strangulation count. You do have Mr. Roper's direct testimony that he was positioned with his elbow on her shoulder and his wrist across her throat, and that he leaned forward, from which the jury could infer that he was applying pressure, or at least attempting to do so, and you had that characterization by Ms. Stoyanovich, which Judge Freeland mentioned, where she was describing what she saw, and she said it looked as though he was strangling her, and that evidence came in, and whether or not an objection should have been made or should have been sustained at that time is not before the court. That is part of the record here, but in deciding the sufficiency evidence, the court can also look to the 404B evidence defendant's intent. The court can look to the verbal, the yelling by the defendant at his wife that preceded the incident at Haleakala, in which he stated, let's do this right now, and acted aggressively. The court can look to his actions with the knife, threatening her with that, and I believe that the, I mean, the red marks on Ms. Fenton's chest, I think, are subject to some different interpretations in light of the defense evidence in this case, but in viewing that evidence in the light most favorable to the government, the court can credit that the jury concluded that those marks were some evidence of the fact that pressure was applied to the test area. So, taking all the... You agree, though, that, and I agree with the positions you stated, but there isn't a need, it's not as if the government needed to prove marks to support the strangulation case, correct? That's correct, and the statute and the Ninth Circuit instructions on that point are clear, and in fact, the government does not have to prove that a completed strangulation occurred. The definition includes an attempt, and so, just the observations of the eyewitnesses here are sufficient under the standard of review to sustain the conviction. Meaning the government doesn't actually have to show that there ever was an impeding of normal breathing, just that there was an attempt to do so. That's correct, Your Honor, and that's certainly, the evidence is certainly sufficient to do that here. And I'll turn it to the court, if you have any questions on the other major areas raised on the brief, but otherwise, I'm comfortable submitting the arguments that we put in our answering brief on those points. All right, thank you very much, counsel. Rebuttal, I'm going to give the extra minute, I think, so you have two minutes. You may proceed, but turn on your mic. Hold on, turn on your microphone. That's all right. I've got it, okay. Good. Can you hear me now? Yeah. Yes. I think one reason, one thing that has to be brought up about why this was really propensity evidence, because you have to consider, you know, the statements that both of these witnesses, Grover and Stoyanovich, made to the police. It said absolutely nothing about having a forearm across, you know, the chest or the neck or anything like that, nothing even remotely revolving in strangulation, nothing. And so, in order to... Well, but is that required? Because there's a separate charge for just intent to do harm. I mean, you might have that argument if all it was. Well, even with the intent to do bodily harm, based upon the statements that both of these witnesses made to the police, which were completely different from what they testified to, which, you know, by the time they testified to get around to the government's theory of the case, had the propensity evidence not come in, it clearly was not harmless error here, and it was clearly more prejudicial than probative, because you do have an entirely inconsistent direct examination and cross-examination. And so, the propensity or the other acts evidence, which would not... No weapons and no evidence of strangulation coming in in order to get the government the conviction that it wanted. I mean, this case was really a case of simple assault, and Mr. Berkman was severely prejudiced by what happened here, and we would ask that the very interesting case. And with that, I believe that we are in recess for the rest of the day. Thank you.
judges: Owens, Friedland, Nelson